DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

LORETTA STEVENS and GORDON STEVENS,

Appellants,

v.

FLORIDA PENINSULA INSURANCE COMPANY,

Appellee.

No. 2D2024-0253

_____

August 29, 2025

Appeal from the Circuit Court for Pinellas County; Thomas M. Ramsberger, Judge.

Mark A. Nation and Paul W. Pritchard of the Nation Law Firm, Longwood, for Appellants.

Joseph A. Matera and Andrew A. Labbe of Salmon & Salmon, P.A., Tampa; and Kimberly A. Salmon (substituted as counsel of record), for Appellee.

KHOUZAM, Judge.

Insureds Loretta and Gordon Stevens appeal a judgment for attorney's fees and costs in favor of Florida Peninsula Insurance Company pursuant to proposals for settlement. Because the trial court correctly found that the proposals were valid and enforceable, we affirm.

In 2017, the Insureds filed an action alleging that the Insurer had failed to pay benefits owed under their policy. In 2020, the Insurer served upon both Insureds substantively identical proposals for

settlement, each of which contained a general release. The Insureds did not timely accept the proposals, thereby rejecting them.

Ultimately, in 2022 the trial court entered summary judgment for the Insurer, who thereafter moved for fees and costs based on the rejected proposals for settlement. By the time of the hearing, the Florida Supreme Court had amended Florida Rule of Civil Procedure 1.442 to require that proposals "exclude nonmonetary terms, with the exceptions of a voluntary dismissal of all claims with prejudice and any other nonmonetary terms permitted by statute." *In re Amendments to Fla. R. Civ. P. 1.442*, 345 So. 3d 845, 846 (Fla. 2022). The trial court granted the Insurer's motion and entered the judgment we now review.

On appeal, the Insureds challenge the proposals as invalid and unenforceable. They contend primarily that the general releases should have invalidated the proposals even before the 2022 rule amendment.

But prior to the 2022 rule amendment excluding nonmonetary terms, the mere inclusion of a release was not a bar to enforcement of a proposal for settlement. *See, e.g.*, *State Farm Mut. Auto. Ins. v. Nichols*, 932 So. 2d 1067, 1080 (Fla. 2006) ("The district courts have consistently held, and we agree, that settlement proposals must clarify which of an offeree's outstanding claims against the offeror will be extinguished by any proposed release."); *Carey-All Transp., Inc. v. Newby*, 989 So. 2d 1201, 1206 (Fla. 2d DCA 2008) ("[G]eneral releases contained in proposals for settlement are enforceable to further the policy of encouraging settlements." (alteration in original) (quoting *Bd. of Trs. of Fla. Atl. Univ. v. Bowman*, 853 So. 2d 507, 509 (Fla. 4th DCA 2003)); *Sanchez v. Cinque*, 238 So. 3d 817, 826-27 (Fla. 4th DCA 2018) (reversing denial of attorney's fees under proposal for settlement containing a release); *see also In re Amendments to Fla. R. Civ. P. 1.442*,

2

345 So. 3d at 846 (striking language from former rule 1.442(c)(2)(D) that had required a proposal for settlement to "state with particularity all nonmonetary terms of the proposal").

By its own terms, the amendment to rule 1.442 "bec[a]me effective July 1, 2022, at 12:01 a.m." *In re Amendments to Fla. R. Civ. P. 1.442*, 345 So. 3d at 846. The proposals here had been served and rejected by non-acceptance in 2020, nearly two years prior.

"At the time that the proposals for settlement were made and rejected, therefore, the rule amendment was not applicable." *Betts v. Ace Cash Express, Inc.*, 863 So. 2d 1252, 1255 (Fla. 5th DCA 2004). Rather, "an amendment to rule 1.442, Florida Rules of Civil Procedure, [does not apply] in an on-going case where the acceptance period of a proposal for settlement has expired on the effective date of the amendment." *Id.* at 1253; *cf. Love v. State*, 286 So. 3d 177, 190 (Fla. 2019) (holding a statutory amendment to Stand Your Ground hearings "is a procedural change in the law and applies to all [such] hearings conducted on or after the statute's effective date" but not to hearings conducted prior thereto). Accordingly, the proposals at issue here are valid and enforceable because they satisfied the law in effect at the time they were made.

Finally, we must address our concurring colleague's reading of our decision in *Diecidue v. Lewis*, 223 So. 3d 1015 (Fla. 2d DCA 2017), as creating a new obligation in the process for proposals for settlement. The concurrence suggests that *Diecidue* obligates the offeree to promptly notify the offeror of defects in an offer or risk waiving any such objection.

But *Diecidue* merely says the "better practice" is to raise ambiguities before trial, to increase the likelihood of settlement. *Id.* at 1020. It does not establish any waiver of a challenge to a defective offer,

3

much less simply because the offeree failed to swiftly point out the offeror's deficient work product. Nor do the rule or statute so provide.

It is not for this court to add to the plain text of the statute or the rule of procedure to create a new legal requirement not stated by the legislature or the supreme court. Quite to the contrary, over a century ago our supreme court explained: "Even where a court is convinced that the Legislature really meant and intended something not expressed in the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity." *Forsythe v. Longboat Key Beach Erosion Control Dist.*, 604 So. 2d 452, 454 (Fla. 1992) (quoting *Van Pelt v. Hilliard*, 78 So. 693, 694 (Fla. 1918)).

The concurrence reads a new risk of waiver for anyone who receives a proposal for settlement. But not only has that waiver never been recognized in any legal authority, it also injects a new pitfall in the process that sets up the troubling result in which a court is required to enforce an offer that was never legally valid. *See State v. Atkinson*, 831 So. 2d 172, 174 (Fla. 2002) ("A basic tenet of statutory construction compels a court to interpret a statute so as to avoid a construction that would result in unreasonable, harsh, or absurd consequences.").

A common example helps illustrate a flaw in the concurrence's reasoning. Where an offer is financially unacceptable to the offeree and also contains a defect such as a fatal ambiguity, the concurrence would require the offeree to promptly notify the offeror of how to fix the financially unacceptable offer in order to have the right to later challenge its legal deficiency. But the law places the burden to comply with the legal requirements to make a valid offer squarely upon the offeror; it is not the responsibility of the offeree to assist the offeror in meeting the offeror's own burden to make a legally compliant offer.

4

Ultimately, we affirm because the trial court correctly found that the proposals were valid and enforceable.

Affirmed.

LaROSE, J., Concurs.
MOE, J., Concurs specially.

MOE, Judge, Specially concurring.

The trial judge correctly enforced the proposal for settlement, so I concur in the majority's decision to affirm. I write separately because my reasons for affirming are not entirely the same. And this case implicates areas of Florida law that, in my view, merit further discussion.

Part I explains how I concluded that the trial judge was correct. Within this section, I discuss our precedent in *Diecidue v. Lewis*, 223 So. 3d 1015, 1020 (Fla. 2d DCA 2017). I also address what it means to strictly construe a statute in derogation of common law. Part I encourages litigants in future cases to more fulsomely brief the effect of *Diecidue* in situations, like this one, where the offeree rejects a proposal without specifying the reasons why, and only states its objections after the offeror moves for fees at the end of the case.

Part II addresses Florida's temporal reach analysis. I concur in the majority's assessment that, as a procedural enactment, the 2022 amendments to Florida Rule of Civil Procedure 1.442 were applicable to cases pending as of the effective date, including this case. I also agree that the fact that the amendments were *applicable* to this case does not mean that the amendments governed these proposals, which were served under the version of the rule and the statute in effect in 2020. I write separately because I see value in showing how our analysis of the 2022 amendments to rule 1.442 fits into the broader picture of temporal reach.

In certain respects, Part II is also written to encourage litigants to, in appropriate cases, present the supreme court opportunities to continue the work it began in *Love v. State*, 286 So. 3d 177 (Fla. 2019). In my view, Florida would be well-served if the Florida Supreme Court brought to the analysis of enactments that are remedial and substantive the same clarity *Love* provided for the analysis of procedural enactments.

I.

A. Mr. & Mrs. Stevens

The Stevenses' homeowners insurance policy with Florida Peninsula Insurance Company was in effect from July 1, 2016, to July 1, 2017. In July 2016, they learned that the cast iron drain line under their kitchen cabinet and floor had broken. A plumber told them that it would be necessary to chip up their terrazzo flooring and replace the broken cast iron pipe with PVC.

After learning this, the Stevenses waited to make their claim with Florida Peninsula for a full year. To be clear, the problem could never have been far from their minds. From July 2016 to July 2017 (when they finally made their claim), water would appear from under the cabinets and from the walls whenever it was turned on for any length of time.

The Stevenses have an explanation for why they waited to make the claim: a developer was thinking about making an offer on their house to tear it down. To them, it was preferable to sell the house.

The choice to wait on the developer meant that Mr. and Mrs. Stevens lived in their house without ready access to running water for one full year. They kept the water main turned off during that time. If they needed running water in the house—whether to shower, wash dishes, brush their teeth, or anything else—they would go outside, turn

6

on the water main, and then go back outside and shut it off again as quickly as they could.  If the water was running more than thirty minutes or so, they would find water on the floor of the kitchen and living room.

In the year that they waited, water damage became evident.  They saw paint coming off the baseboards in the living room and kitchen.  Still, they held out hope and did not make a claim with Florida Peninsula.  Instead, they dried out the baseboards with fans and painted them.

The offer from the developer never came.  It was the notification that the developer did not wish to buy the house that led the Stevenses to make a claim to Florida Peninsula on July 6, 2017.

Days after the Stevenses made their claim, Florida Peninsula sent an adjuster to inspect and photograph the house.  Then, on July 21, 2017, Florida Peninsula denied the claim.  The policy required prompt notice, and Florida Peninsula asserted that the Stevenses failed to comply with this contractual post-loss obligation.  Further, Florida Peninsula contended that the Stevenses had not acted reasonably to protect their own home from damage.

In October 2017, the Stevenses sued Florida Peninsula.  They sought prejudgment interest, attorney's fees, and costs.  Florida Peninsula answered, raising as an affirmative defense the contention that the Stevenses had not complied with their contractual post-loss duty to provide prompt notice.

On August 7, 2020, under section 768.79, Florida Statutes (2020) and the version of rule 1.442 in effect at that time, Florida Peninsula served the Stevenses with proposals for settlement in the amount of $5,000 each.  Identical in all respects except for the recipient, the

7

proposals included an attached general release. Prior to the deadline to respond to the proposals, the Stevenses stated no objections, sought no clarification, and raised no perceived ambiguities. Neither Mrs. Stevens nor Mr. Stevens responded to the proposals directed to them, so they were deemed rejected.

The litigation went on for another two years before Florida Peninsula moved for and was granted summary judgment against the Stevenses. The basis for summary judgment was that, as a matter of law, the Stevenses failed to give Florida Peninsula prompt notice. The trial court also determined that there was no genuine issue of material fact that there was no damage to the property when the water leak occurred on July 6, 2016.

After (1) summary judgment was granted and (2) Florida Peninsula sought an award of fees in light of the Stevenses' rejection of its proposals for settlement, the Stevenses raised—for the first time—various alleged "deficiencies" in the proposals and releases which, according to the Stevenses, "rendered them unenforceable." It was at this point that the Stevenses first complained that the proposals were ambiguous, contained impermissible conditions, required the release of extrinsic claims, and were not made in a good faith effort to settle the claim.

### B. Section 768.79, Florida Statutes

Our analysis of the proposals for settlement in this case is governed by section 768.79. That statute provides that "if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant *shall* be entitled to recover reasonable costs and attorney's fees." § 768.79(1) (emphasis added). A valid proposal must:

> (a)   Be in writing and state that it is being made pursuant to this section.

8

(b)     Name the party making it and the party to whom it is being made.
(c)     State with particularity the amount offered to settle a claim for punitive damages, if any.
(d)     State its total amount.

§ 768.79(2).  "The offer *shall* be construed as including all damages which may be awarded in a final judgment."  *Id.* (emphasis added).

If a defendant's proposal for settlement meets the requirements of section 768.79(2), it is not timely accepted under section 768.79(4), and the offeror timely moves for fees under section 768.79(6)—all conditions satisfied here—then "the court *shall* determine" the amount to be awarded under the process outlined in section 768.79(6)(a).  *Id.* (emphasis added).  "[T]he defendant *shall* be awarded reasonable costs . . . and attorney's fees," and "the court *shall* enter judgment for the defendant against the plaintiff for the amount of the costs and fees."  *Id.* (emphasis added).

The statute contains only one textual allowance for discretion on the matter of entitlement:  in section 768.79(7)(a), the court has discretion to "disallow an award of costs and attorney's fees" if the court determines "that an offer was not made in good faith."

While the statute provides very little in the way of discretion on the matter of entitlement, it provides broader latitude on the amount to be awarded.  When determining the reasonable amount to award, the trial court considers enumerated factors as well as "all other relevant criteria." § 768.79(7)(b).

### C.  Rule 1.442

The Florida Supreme Court adopted rule 1.442 to establish the procedure for invoking section 768.79.  The rule is largely repetitive of

the statute but, as the chart below reflects, the rule in effect in 2020 added various requirements to the statute in effect in 2020.

| Requirement[1,2] | Statute | Rule |
|---|---|---|
| Offer must be in writing and state that it is being made pursuant to this section | § 768.79(2)(a) | 1.442(c)(1) |
| Offer must name the party making it and the party to whom it is being made | § 768.79(2)(b) | 1.442(c)(2)(A) |
| Offer must state with particularity the amount offered to settle a claim for punitive damages, if any | § 768.79(2)(c) | 1.442(c)(2)(E) |
| Offer must state its total amount | § 768.79(2)(d) | 1.442(c)(2)(D) |
| Offer must state with particularity all nonmonetary terms of the proposal | No textual requirement in the statute | 1.442(c)(2)(D) |
| Proposal shall state that the proposal resolves all damages that would otherwise be awarded in a final judgment in the action in which the proposal is served, subject to rule 1.442(c)(2)(F) | No textual requirement in the statute | 1.442(c)(2)(B) |
| Proposal shall state with particularity any relevant conditions | No textual requirement in the statute | 1.442(c)(2)(C) |

---

[1] Presumably no distinction is meant to be drawn between the statute's use of "must" and the rule's use of "shall."

[2] The 2020 versions of section 768.79 and rule 1.442 are used throughout this chart.

10

| | | |
|---|---|---|
| Proposal shall state whether the proposal includes attorneys' fees and whether attorneys' fees are part of the legal claim | No textual requirement in the statute | 1.442(c)(2)(F) |
| Proposal shall include a certificate of service in the form required by Florida Rule of General Practice and Judicial Administration 2.516 | No textual requirement in the statute | 1.442(c)(2)(G) |

## D. Application of the Statute and Rule to this Case

The reason the motion for fees was properly granted in this case is that the offer complied with section 768.79 and rule 1.442. Because it complied with those requirements and the record reveals no legitimate basis to conclude that the proposals were not made in good faith, the motion was properly granted. In theory, the analysis could end there. However, the Stevenses argued that even if the proposals complied with the statute and the rule, the proposals were unenforceable because the Stevenses found the proposals ambiguous.

## E. Strict Construction

The phrase "death by a thousand tiny cuts" has long been understood to mean a series of small and seemingly insignificant things that have an ultimately devastating impact. Some might say this is a fair description of what has happened with proposals for settlement in Florida. Particularly as it relates to the idea of ambiguities, it is an extraordinary paradox that the will of the people of Florida is expressed in a relatively simple statute that contains the word "shall" no less than fourteen times, but cases "strictly construing" that statute have

11

concluded that judges have significant discretion to deny a motion for fees even when a proposal met each technical requirement of the statute.

It may seem surprising to have this discussion in a case in which the trial judge properly granted the motion for fees. But the basis of my disagreement with the majority's reasoning seemingly turns on our divergent views of what strict construction should mean and its impact on certain precedent addressing objections.

The question is not whether the statute and the rule must be strictly construed. In *Willis Shaw Express, Inc. v. Hilyer Sod, Inc.*, 849 So. 2d 276, 278 (Fla. 2003), the Florida Supreme Court held that section 768.79 and rule 1.442 "must be strictly construed because the offer of judgment statute and rule are in derogation of the common law rule that each party pay its own fees."

The question is what strict construction compels us to do. Strict construction is an interpretive principle that can mean one of two things. It can mean "that the interpreter holds tight to the fair meaning of the law," in which case Scalia and Garner believe "the doctrine would be sound." Antonin Scalia & Bryan Garner, *Reading Law: Interpretation of Legal Texts* 355 (2012) (discussing canon 62, titled "The false notion that words should be strictly construed"). But strict construction can also mean a "narrow, crabbed reading of a text." *Id.* To be clear, Scalia and Garner so thoroughly eviscerate strict construction as a method of interpretation that it is astonishing that Florida has not abandoned the idea altogether. If there are any judges in Florida who don't have a copy of *Reading Law* and consult it regularly, that number is presumably getting smaller by the year. Indeed, it might be that this part of our precedent remains alive not because it is on such solid ground, but because it is so confusing and inconsistent that a lower court is free to

reject the form of strict construction that requires a "narrow, crabbed reading" that cuts against the fair meaning of the law, in favor of the form that "holds tight" to the fair meaning instead.

If we were to do the kind of strict construction that "holds tight to the fair meaning" of section 768.79 and rule 1.442, then a predictable result would be that rejection of a proposal for settlement served in technical conformity with the rule and the statute will result in an award of fees and costs. Use of "shall" generally conveys a sense that the judge does not have discretion, after all. *See Shall, Black's Law Dictionary* 1657 (12th ed. 2024). Unless the trial court found that the proposal was not made in "good faith," the only question would be the reasonable amount of fees and costs to be awarded. Holding tight to the fair meaning of the statute and the rule is also consistent with the idea that "an offer that complies with section 768.79 and Rule 1.442 creates a 'mandatory right' to collect attorneys' fees." *Anderson v. Hilton Hotels Corp.*, 202 So. 3d 846, 856 (Fla. 2016).

Of course, anyone who has practiced law in Florida in the last twenty years would roll their eyes at the idea that enforcement of a proposal for settlement is predictable. Some might even say that the inability to predict whether a judge will grant entitlement is the only thing predictable about a proposal for settlement. When the offeror moves for fees and costs under the statute, whichever party rejected the proposal almost invariably argues that it is unenforceable because of some ambiguity. Ambiguity is in the eye of the beholder, so this argument can be remarkably effective in thwarting the will of the people enacted in section 768.79.

Let's pause here. Where did we get the idea that if the trial court finds ambiguity in the proposal, then it has discretion to deny

13

entitlement to fees and costs under the statute?  The text of the statute—the same one that we are bound to strictly construe—says nothing about ambiguity.  Nor is there anything about ambiguity in the rule.  Perhaps in their quest for strict construction, judges came up with the idea.  If so, wouldn't it be ironic if strictly construing an enactment led to intended beneficiaries who fully complied with the enactment being deprived of the enactment's benefits?  If judges were required to generate their own business, then they scarcely could have conceived a better way to do it.

Returning to the precedent, although "the proposal under the statute and the rule must be sufficiently clear and free of ambiguity to allow the offeree the opportunity to fully consider the proposal" this does not require the elimination of every ambiguity, because that "may be impossible" and "[t]he rule does not demand the impossible." *Anderson,* 202 So. 3d at 852-53 (quoting *State Farm Mut. Auto. Ins. Co. v. Nichols*, 932 So. 2d 1067, 1079 (Fla. 2006)).  It is merely necessary that the proposal "be sufficiently clear and definite to allow the offeree to make an informed decision *without needing clarification.*"  *Id.* at 855 (emphasis added) (quoting *Nichols*, 932 So. 2d at 1079).  After all, "[u]ltimately, '[p]roposals for settlement are intended to end judicial labor, not create more.' "  *Id.* (quoting *Lucas v. Calhoun*, 813 So. 2d 971, 973 (Fla. 2d DCA 2002)).  The purpose of the rule and the statute is to "promote prompt and good-faith efforts to settle claims."  *Id.*  To this end, the Florida Supreme Court has made clear that some ambiguity is expected and clearly permissible; what is not permissible is judicial nitpicking and after the fact quests for ambiguity.  *Id.* at 853 (citing *Carey–All Transp., Inc. v. Newby*, 989 So. 2d 1201, 1206 (Fla. 2d DCA 2008)).

F. *Diecidue v. Lewis*

Lower courts are bound by precedent of higher courts. Even if it concluded that a higher court strictly construing a statute somehow rewrote the statute in the process, a district court cannot disregard that precedent. But a lower court that is bound to follow precedent is not completely without agency. In *Diecidue*, we appropriately recognized and disapproved of the exact litigation behavior the ambiguity escape hatch spawned: a litigant initially rejected a proposal for settlement, the outcome of the litigation was unfavorable, and then the litigant made "post hoc attempts to conjure up ambiguities in proposals for settlement to get a second bite at the apple." 223 So. 3d at 1019-20.

We were sufficiently concerned about this practice that three judges of this court agreed to take up an entire paragraph of a fairly brief opinion to say that we saw the case as

> a vehicle to emphasize that it is better practice for an offeree to raise any ambiguities in proposals for settlement with the offeror before trial. This will increase the probability that any subsequent offers may better reflect the intent of the parties and better ensure that courts are not unnecessarily injected into disputes that can otherwise be amicably resolved.

*Id.* at 1020. In his concurrence, Judge Casanueva "fully concur[red] in the majority opinion" but wrote separately to "discuss a concern caused by the proposal for settlement utilized in this manner and how such a proposal for settlement can be used in other matters for the purpose of attaining a tactical advantage rather than for the recognized purpose of ending litigation . . ." *Id.* (Casanueva, J., concurring).

What merciless criticism met *Diecidue* when the case made its way to the supreme court? None. The supreme court cited the *Diecidue*

15

concurrence when it amended Rule 1.442. *In re Amendments To Fla. R. of Civ. P. 1.442*, 345 So. 3d at 845.

I believe the majority agrees that *Diecidue* remains good law in the Second District. And other precedent from this court says that "a three-judge panel of a district court of appeal is not at liberty to overrule or recede from a prior panel's controlling decision on the same point of law" without first seeking *en banc* consideration from the entire court. *State v. Crose*, 378 So. 3d 1217, 1243-44 (Fla. 2d DCA 2024) (emphasis added) (quoting *Wood v. Fraser*, 677 So. 2d 15, 18 (Fla. 2d DCA 1996)).

Yet it is the meaning that we believe should be given to *Diecidue* that divides us. The majority believes that *Diecidue* has little to no application here; I disagree.

Each of the following statements are, in my view, not reasonably in doubt: (1) we are bound to strictly construe the statute and the rule; (2) a reasonable meaning of strict construction is that we must "hold tight to the fair meaning of the law"; (3) neither the statute nor the rule gives the court discretion to deny a motion for fees on the basis that the proposal was ambiguous; (4) the purpose of the rule and the statute is to "promote prompt and good-faith efforts to settle claims"; and (5) if an offeree believes a proposal is ambiguous, then "the better practice" is for the offeree to raise a timely objection.

Here, the Stevenses rejected the proposals without making any objection about ambiguities in them. *Diecidue* was good law at the time, as it remains today. It seems fair, then, to infer that the reason the Stevenses rejected the proposals did not really relate to the ambiguity they argued to the trial court after they lost on summary judgment. All of this weighs in favor of affirming the trial court's conclusion that the proposals were not ambiguous.

16

The majority seems hesitant to say that this is the right application of *Diecidue*. As far as I can tell, it is the majority's view that when we articulated the "better practice" of raising objections, we simply meant that this is what a good lawyer would do. But even if "better practice" is merely a rule of etiquette (and I do not read it that way), even Miss Manners would agree that if you ignore a rule of etiquette then some people are going to draw negative inferences about you. *See also* Richard Duffy, *Introduction: Manners and Morals*, in Emily Post, *Etiquette: The Blue Book of Social Usage* ix-xii (Funk & Wagnalls 1927) ("[T]he kinship between conduct that keeps us within the law and conduct that makes civilized life worthy to be called such, deserves to be noted with emphasis.").

I am also troubled by the idea that the "better practices" language of *Diecidue* means nothing here because it is dicta. To be sure, it is dicta. "Any statement of law in a judicial opinion that is not a holding is dictum." *Pedroza v. State*, 291 So. 3d 541, 547 (Fla. 2020). We don't treat dicta as a holding, but that doesn't mean dicta is worthless. *See* Bryan Garner et al., *The Law of Judicial Precedent* 603 (2016) (discussing the predictive value of dicta in various contexts); *see also Harris v. Sentry Title Co.*, 806 F.2d 1278, 1280 n.1 (5th Cir. 1987) (courts "often address[] issues for the guidance of the parties and the [lower courts] on remand. It cannot be said that such considered statements should be dismissed as dictum simply because the Court was not absolutely required to raise and address such an issue."); *Cole Energy Dev. Co. v. Ingersoll-Rand Co.*, 8 F.3d 607, 609 (7th Cir. 1993) (noting that "explicit directives by that court to the lower court concerning proceedings on remand are not dicta" even when the court refers to its directives as "useful comments" or the like and judges are not free to ignore them); *Sonic-Calabasas A, Inc. v.*

17

*Moreno,* 311 P.3d 184, 212 (Cal. 2013) ("Statements by appellate courts 'responsive to the issues raised on appeal and . . . intended to guide the parties and the trial court in resolving the matter following . . . remand' are not dicta." (quoting *Garfield Med. Ctr. V. Belshe,* 80 Cal.Rptr.2d 527, 531 (1998))).

I also disagree that giving logical effect to *Diecidue* somehow keeps us from, in a future case, finding ambiguity in the absence of a timely-raised objection. *Diecidue* set an "if you see something, say something" expectation because objections to proposals for settlement should be articulated while there is time for the offeror to address the objection by serving a new proposal. Sometimes the failure to timely object will undermine the appellant's argument that the proposal was rejected because it was ambiguous, as I think it did here. In other cases, the proposal might be so obviously ambiguous to the court that the failure to say so can be excused. In all of this, an appellant has the burden to demonstrate error on appeal. *Applegate v. Barnett Bank of Tallahassee,* 377 So. 2d 1150, 1152 (Fla. 1979).

### G. Statutes in Derogation of the Common Law

Where the majority is not ready to give *Diecidue* the effect that I propose, I am concerned that its reasoning may be rooted in the idea that it is wrong to in any way imply that an offeree should behave with a degree of good faith because section 768.79 is "in derogation of the common law that ordinarily requires each party to pay its own attorneys' fees." *Anderson,* 202 So. 3d at 852. If true, this case highlights why it might be worthwhile for the Florida Supreme Court to reconsider its precedent about "statutes in derogation of the common law."

As expressed through their elected representatives, it seems very obvious that Floridians believe more must be done to promote prompt

18

resolution of civil lawsuits. Since at least the enactment of the proposal for settlement statute in the 1980s, there has been a persistent legislative effort towards these ends. Yet an ordinary Floridian who reads the opinions generated since that time might argue that the judicial branch sometimes gets in the way.

On the one hand, courts have acknowledged that section 768.79 was meant to "encourage [the] parties to settle . . . without going to trial." *Aspen v. Bayless*, 564 So. 2d 1081, 1083 (Fla. 1990). In the discharge of its constitutional duty to make rules for practice and procedure in the courts, the Florida Supreme Court has been clear that the objectives of our branch are aligned with the will of the people. For example, Florida's first rule of civil procedure, rule 1.010, directs that our rules of civil procedure must be construed in a manner that will "secure the just, speedy and inexpensive determination of every action." Fla. R. Civ. P. 1.010; *see also* Winston E. Arnow & Clarence E. Brown, *Florida's 1954 Rules of Civil Procedure*, 7 Fla. L. Rev. 125, 129 (1954).

Yet it seems as though the only rule in the rules of civil procedure that seems to be exempted from rule 1.010 is rule 1.442. Doesn't rule 1.442 exist for the same basic reason as rule 1.010? *Willis Shaw* explains the reasons we do things this way. 849 So. 2d at 276. In *Willis Shaw*, the Florida Supreme Court held that section 768.79 and rule 1.442—both enacted to promote speedy and efficient resolution of disputes, just like rule 1.010—"must be strictly construed because the offer of judgment statute and rule are in derogation of the common law rule that each party pay its own fees." *Id.* at 276.

This idea that *Willis Shaw* created a unique rule of construction for rule 1.442 is nothing new. *See* Lauren Rehm, *A Proposal for Settling the Interpretation of Florida's Proposals for Settlement*, 64 Fla. L. Rev. 1811,

1831 (2012).  But as others have recognized, we ought to be concerned with the idea that we have imposed, judicially, a rule of construction specific to rule 1.442 that stacks the deck against the will of the people as expressed by the Florida Legislature.  *Kuhajda v. Borden Dairy Co. of Ala.,* 202 So. 3d 391, 396 (Fla. 2016) ("A procedural rule should not be strictly construed to defeat a statute it is designed to implement."); *Campbell v. Goldman,* 959 So. 2d 223, 228 (Fla. 2007) ("No confusion exists regarding the plain meaning of the rule's language.  Moreover, if this court rule was ambiguous, the standard of construction stated in rule 1.010 would apply, not the derogation canon.") (Bell, J., concurring in result only).

Even though Florida adopted statutorily the common law of England through July 4, 1776, it was adopted only to the extent that it was "not inconsistent with the Constitution and laws of the United States and acts of the Legislature of this state."  Fla. Stat. § 2.01 (2025). This is no support, then, for the conclusion that the legislature prefers the work of this branch (or the pre-July 4, 1776, common law of England) over the will of the people as enacted by the Florida Legislature and signed into law by the Governor of Florida.

The idea that statutes in derogation of the common law should be strictly construed reflects a sovereign-displacement concern far more reasonable in a pre-American legal order in which "the monarch was the de jure and de facto head of state, and statutes were regarded as derogating from the common law."  Scalia & Garner, *supra,* at 349. Scalia and Garner consider this particular canon "a relic of the courts' historical hostility to the emergence of statutory law" and opine that "[t]he better view is that statutes will not be interpreted as changing the common law unless they effect the change with clarity" because "[t]here

20

is no more reason to reject a fair reading that changes the common law than there is to reject a fair reading that repeals a prior statute." *Id.* at 318.

Some have described the rule that a statute in derogation of the common law must be strictly construed as "nothing other than a judicial preference for common law and a belief in the moral superiority of that law," at least in certain contexts. Barbara Page, *Statutes in Derogation of the Common Law: The Canon as an Analytical Tool*, 1956 Wis. L. Rev. 78, 106 (1956). If true, one wonders how we defend "a belief in the superiority of the common law," when such a belief is seemingly "irrelevant and in direct contradiction to the court's avowed purpose of keeping to its proper role in the separation of powers." *Id.* at 109. In particular, "[t]he use of a canon of construction to enforce a particular policy" is most objectionable "where it mask[s] the real reasons for judicial action," since "such technique of decision derogated from that clearcut responsibility for decision which is itself a basic requirement of sound government." *Id.*

"It can with reason be urged that any rule of interpretation in the nature of a presumption should have a logical core, that it should either be well grounded in actual experience or rested upon sufficiently compelling considerations of policy." Jefferson B. Fordham & J. Russell Leach, *Interpretation of Statutes in Derogation of the Common Law*, 3 Vanderbilt L. Rev. 438, 442 (1950). Yet the known defenses to the derogation canon are almost universally hostile to the separation of powers protections secured in the Florida Constitution. Those defenses, which include the idea that "the common law is the perfection of human reason and is definitely superior to statute law" and that the common law is "a better quality of law than statute law" have not in any obvious

21

sense been squared with the idea that statutes express the will of the people and that the people are the ultimate sovereign. *Id.* at 442.

While some have said that the canon is "an essential guiding rule" because "without it the continuity of legal development would be gravely imperiled; and it becomes the more necessary when we remember how few statutes are wholly innovations and how many . . . are extensions or modifications of existing Common Law rules," others counter that "[t]his is a type of proposition the truth of which would be very difficult to demonstrate" and "[o]ne wonders why it is that the value of continuity could not be preserved by interpreting a statute in the light of its common law context without, at the same time, insisting upon some sort of predisposition against changes in the common law." *Id.* at 442-43 (quoting Carleton Allen, *Law in the Making* 379 (4th ed. 1946)).

Another defense for the canon is that some state constitutions contain provisions that "no law may be revived or amended unless the new act contains the entire act to be revived or the section or sections amended." *Id.* at 443. If this is what the supreme court intended to say in *Willis Shaw,* someone should point us back to what part of the Florida Constitution justifies the conclusion.

Without a constitutional root, even the use of "derogation" suggests a sovereign-displacement concern inconsistent with our constitutional order. "Derogation," when used as a noun, means a "partial repeal" or "a taking away, lessening, or detraction, especially of power, reputation, and value." *Derogation, Webster's Third New International Unabridged Dictionary* 609 (2002). In Florida, the sovereign is the people of Florida. Our sovereign speaks through its representatives in the legislature. If by passage of a statute through its elected representatives the sovereign chooses to enter a space previously occupied exclusively by the judicial

22

branch, is it appropriate for the judicial branch to scramble to preserve the maximum remainder of our influence?  Might we say that the very enactment of a statute that "repeals, takes away, lessens, or detracts from" the common law suggests that (1) the people want things to change from the common law and (2) their ability to be governed as they choose is what is most vital to preserve, as a matter of constitutional law?

Section 768.79 and its repeated amendments reflect that Floridians are done with the idea of an absolute rule that requires each party to bear its own fees and costs at the end of litigation.  Since ambiguity objections seem to be entirely a creation of this branch, it does not seem necessary for the legislature to amend the statute *again* before we can say that an offeree ought to raise ambiguity objections when there is still time for an offeror to amend the proposal.

II.

Unlike the first issue, I see no daylight between me and the majority on whether the 2022 amendments to rule 1.442 applied to the proposals in this case.  The amendments did not apply because although a new procedural enactment is applicable to a pending case, the posture of the case did not permit it here.

Though we agree that the 2022 amendments did not apply, and we also agree on the reasons, I write separately on this issue for a specific reason.  The temporal reach of enactments is an exceedingly important field of Florida law.  I wholeheartedly agree with the assessment that "predictability in application of newly amended rules and statutes remains elusive—if not imprecise under our current precedent." *Fed. Express Corp. v. Sabbah*, 357 So. 3d 1283, 1288 (Fla. 3d DCA 2023) (Gordo, J., concurring in result only).  I write this expressly to encourage the Florida Supreme Court to address temporal reach more

23

comprehensively and to encourage briefing on these issues in appropriate cases.

Here, oral argument revealed the extent of the parties' uncertainty about the temporal reach of an amendment to a rule of civil procedure. In my view, *Love*, 286 So. 3d at 184, squarely resolved the issue. The Florida Rules of Civil Procedure are, of course, procedural. A new or amended procedural enactment applies to pending cases, if the posture of the case permits it. *Id.* The problem here was that the posture of the case did *not* permit application of the amended rule governing the service of proposals. The reason the posture did not permit it is that the proposals had already been served when the amendment took effect.

To apply the 2022 amendments to rule 1.442 to already-served proposals would have disturbed a case event that was already completed. Application of a new or amended procedural enactment in a way that requires the re-doing of the case event governed by the enactment is the essence of a retroactive application. Hypothetically, if another set of proposals had been served after the amendment took effect, then that set of proposals would have been governed by the amended rule.

In the "confusing and often unintelligible" precedent regarding temporal reach, *Fed. Express Corp.*, 357 So. 3d at 1286 (Gordo, J., concurring in result only), some confusion may be attributable to the narrow tailoring of opinions. The net effect of writing narrowly on this topic is that the overall framework too easily remains hidden. I try not to perpetuate this here.

### A. Temporal Reach Framework in Florida

When the law changes, a dispute frequently arises over whether the change in the law applies to a given case. A change in the law can arise from (1) a statutory change, (2) a change to a rule of practice and

procedure, or (3) a decisional change. The term "enactment" covers categories (1) and (2) only. This discussion is confined to changes in the law that are statutory or rules of practice and procedure. Because I see no reason to do it, I draw no distinction between those two categories. I also draw no distinction between new and amended enactments. The term "temporal reach" refers to the inquiry into whether a change in the law applies to a given case.

The temporal reach of an enactment turns on the nature of the enactment. *See, e.g., Bionetics v. Kenniasty*, 69 So. 3d 943, 948 (Fla. 2011); *Love*, 289 So. 3d at 180; *Smiley v. State*, 966 So. 2d 330, 334 (Fla. 2007). So the first step in the analysis requires a decision about whether the enactment is substantive, procedural, or remedial.

### 1. Procedural

Procedural enactments represent the easy part of the temporal reach analysis. This is because the supreme court fairly recently explained the temporal reach of procedural enactments in *Love v. State*. If a change in the law is procedural, it is applicable to cases pending on the effective date if the posture of the case permits it. *Love*, 286 So. 3d at 180. Applying a procedural change to a pending case is not a "retroactive" application unless applying the change would require doing over an already-completed case event governed by the rule. *Id.* As noted previously, this case presented a clean application of *Love*.

### 2. Substantive

The analysis becomes more complex with substantive enactments. If an enactment is substantive, there are additional steps. First, the court must look for a clear expression in the enactment that the legislature intended for the enactment be applied retroactively. *Bionetics*,

69 So. 3d at 948. If there is no clear expression of an intent that the enactment apply retroactively, then the analysis ends there.

If the legislature clearly expressed an intent that a substantive enactment should be applied retroactively, then the last step is to ask "whether retroactive application is constitutionally permissible." *Bionetics*, 69 So. 3d at 948. So long as it does not "offend due process" because it is "particularly 'harsh and oppressive,' " retroactive legislation is lawful. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 711, 733 (1984).

Temporal reach is an endeavor that demands careful attention to definitions. An enactment is defined as substantive if it "defines, creates, or regulates rights—'those existing for their own sake and constituting the normal legal order of society, i.e., the rights of life, liberty, property, and reputation.' " *DeLisle v. Crane Co.*, 258 So. 3d 1219, 1224 (Fla. 2018) (citing *Allen v. Butterworth*, 756 So. 2d 52, 59 (Fla. 2000)).

Although certain aspects of Florida's temporal reach precedent differ from the federal precedent, the meaning of retroactivity in Florida is the same as it is on the federal side. *Love*, 286 So. 3d at 186-87 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1997)). Under that federal standard, a retroactive application is defined as one that "impair[s] rights a party possessed when he acted, increase[s] a party's liability for past conduct, or impose[s] new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. Retroactive legislation is often enacted in an effort to "readjust[] rights and burdens imposed in the past" or "impose a new duty or liability based on past acts." *Pension Benefit Guar. Corp.*, 467 U.S. at 729-30.

Careful attention to definitions can raise important questions. For example, a side-by-side examination of the existing definitions of

26

substantive and retroactive seemingly exposes a potential source of confusion about the retroactive application of substantive rights.

| Definition of Substantive | Definition of Retroactive |
|---|---|
| Defines rights<br>Creates rights<br>Regulates rights | Impairs rights<br>Increases liability<br>Imposes new duties |

Consider *Menendez v. Progressive Express Ins. Co.*, 35 So. 3d 873 (Fla. 2010). There, the Florida Supreme Court (1) found a change to a statutory presuit notice provision to be substantive, (2) concluded that the legislature intended for the statutory change to apply retroactively, but then (3) refused to apply the statute because it had the characteristics of a substantive enactment. *See id.* at 877 ("In this case, we conclude that the Legislature intended for the statutory presuit notice provision to be applied retroactively. However, even when the Legislature has expressly stated that a statute will have retroactive application, this Court will reject such an application if the statute impairs a vested right, creates a new obligation, or imposes a new penalty."). *Compare DeLisle*, 258 So. 3d at 1224 (describing an enactment as substantive if it "defines, creates, or regulates rights"), *with Menendez*, 35 So. 3d at 877. One could read *Menendez* and conclude that the supreme court did not believe it was constitutional to apply a substantive enactment retroactively because it was substantive.

*State Farm v. LaForet*, 658 So. 2d 55 (Fla. 1995), is interesting to consider through the same lens. In *LaForet*, the Florida Supreme Court considered a newly enacted statute that altered the damages available in a bad faith action brought under section 624.155, Florida Statutes. *Id.* at 61. The Court found that the statute was substantive in nature and that

27

the legislature expressly stated that the enactment was meant to be applied retroactively. *Id.* at 61. Then it declined to give the statute retroactive application because the effect of the statute was to create a new penalty for insurance companies acting in bad faith. *Id.* at 61-62.

Like *Menendez*, one could read *LaForet* and conclude that a statute cannot not be applied retroactively if it meets the definition of a substantive enactment. *LaForet* adds further complexity to the analysis because, with no discussion about how the enactment was constitutionally offensive, the court disapproved of two lower court cases that had applied the statute retroactively. *Id.* at 62.

While at first blush *Metropolitan Dade County v. Chase Housing Corp.*, 737 So. 2d 494 (Fla. 1999), suggests that it is possible for a substantive enactment to be applied retroactively, the Court's reasoning limits its utility for that purpose. There, the Florida Supreme Court found that (1) the change in the law was substantive, (2) the legislature clearly expressed an intent that the change be applied retroactively, and (3) retroactive application did not offend the constitution. *Id.* at 505. The problem with looking to *Metropolitan Dade* as the answer key is that *Metropolitan Dade* turned on the fact that the defendant was a unit of local government, and local governments are a child of the legislature. *Id.* at 505 ("[W]e emphasize that a different result might well be reached if these immunity provisions were applied to abrogate the cause of action of a private plaintiff rather than a government entity's cause of action.").

### 3. Remedial

If the enactment is remedial, then it is to be applied to pending cases "whenever possible." A remedial enactment presumptively enjoys a broader temporal reach than procedural and substantive statutes— remedial statutes "are to be applied retrospectively *and* are to be applied

28

to pending cases." *See, e.g., Love*, 286 So. 3d at 187 (emphasis added) (quoting *Alamo Rent-a-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1358 (Fla. 1994)); *Smiley v. State*, 966 So. 2d 330, 334 (Fla. 2007) ("[T]he 'presumption in favor of prospective application generally does not apply to "remedial" legislation; rather, whenever possible, such legislation should be applied to pending cases in order to fully effectuate the legislation's intended purpose.'") (quoting *Arrow Air, Inc. v. Walsh*, 645 So. 2d 422, 424 (Fla. 1994)).

Given the broad reach to which remedial enactments are presumptively entitled, it is unfortunate that it is hard to pinpoint what it means for an enactment to be remedial. In *City of Lakeland v. Cantinella*, 129 So. 2d 133, 137 (Fla. 1961), the Florida Supreme Court said that "[r]emedial statutes or statutes relating to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of rights already existing, do not come within the legal conception of a retrospective law, or the general rule against retrospective operation of statutes." *Id.* at 137.

*Cantinella*'s definition of "remedial" raises more questions than it answers. Indeed, *Smiley* suggests that *Cantinella*'s discussion of a remedial statute was not a definition at all. *Smiley* suggests that this language from *Cantinella* should be read not as a definition, but as an instruction about how to apply remedial statutes. *Smiley*, 966 So. 2d at 334 ("The rule for procedural/remedial changes, in contrast to the presumption against retroactive application for substantive changes, is as follows: 'Remedial statutes or statutes relating to remedies or modes of procedure, which do not create new or take away vested rights, but only operate in furtherance of the remedy or confirmation of rights already

29

existing, do not come within the legal conception of a retrospective law, or the general rule against retrospective operation of statutes.' " (quoting *Cantinella*, 129 So. 2d at 136)).

Smiley itself did not offer its own definition, unfortunately. Moreover, *Smiley* complicated the work of defining a remedial enactment because it seems to equate remedial and substantive statutes. *Id.* ("Finally, a statute that achieves a 'remedial purpose by creating substantive new rights or imposing new legal burdens' is treated as a substantive change in the law." (quoting *Arrow Air, Inc.*, 645 So. 2d at 424)).

This leaves remedial enactments as the great frontier of temporal reach. In an appropriate case, someone should press for an explanation of what it means to be remedial. The definition of "remedial" in Black's Law Dictionary seems like a helpful place to start:

> 1. Affording or providing a remedy; providing the means of obtaining redress <a remedial action>. 2. Intended to correct, remove, or lessen a wrong, fault or defect <a remedial statute>. 3. Of, relating to, or involving a means of enforcing an existing substantive right <a remedial right>.

*Remedial, Black's Law Dictionary* 1550 (12th ed. 2024). Arguably, the first and third definitions are consistent with how Florida defines a substantive enactment. *DeLisle*, 258 So. 3d at 1224 (noting an enactment is considered substantive if it "defines, creates, or regulates rights—'those existing for their own sake and constituting the normal legal order of society, i.e., the rights of life, liberty, property, and reputation' " (quoting In re Fla. Rules of Criminal Procedure, 272 So. 2d 65, 65 (Fla. 1972) (Adkins, J., concurring))); *see also id.* (recognizing that "[g]enerally the Legislature has the power to enact substantive law while

this Court has the power to enact procedural law" (citing *Allen v. Butterworth*, 756 So. 2d 52, 59 (Fla. 2000)). The precedent directs such a different analysis of the temporal reach of substantive and remedial enactments that is very hard to believe that, properly defined, substantive and remedial mean the same thing.

If substantive and remedial are not synonymous (a conclusion compelled by examination of the broader analytical framework) then this leaves the remaining definition of remedial as the most accurate one. That definition of remedial—"intended to correct, remove, or lessen a wrong, fault or defect"—bears a distinct meaning focused not on what the enactment *is* but what it is intended to *do*. This idea that remedial means "intended to fix something" also aligns with the direction that remedial enactments (1) ought to be applied both retroactively and to pending cases and (2) could have qualities that were either substantive or procedural.

Think of this definition of remedial in the context of the change in the proposal for settlement rule. The Florida Supreme Court identified something that needed to be fixed:

> The amendments are intended to align rule 1.442 with the substantive elements of Florida's settlement proposal statutes. Section 768.79, Florida Statutes (2021), does not provide for the inclusion of nonmonetary terms in a proposal for settlement. . . .
>
> Accordingly, to be consistent with the substantive elements of the various settlement proposal statutes, we amend Florida Rule of Civil Procedure 1.442.

*In re Amends. To Fla. Rules of Civ. Proc. 1.442*, 345 So. 3d 845, 845-46 (Fla. 2022). *Love* makes clear that a change in procedure could, in theory, apply retroactively, if the Florida Supreme Court chose to direct

31

it. *Love*, 286 So. 3d at 188 (noting that rules of procedure are prospective "unless specifically provided otherwise" (quoting *Perlstein v. King*, 610 So. 2d 445, 446 (Fla. 1992))). With the amendments to rule 1.442, the need to correct the rule was not so pressing that, as a matter of branch policy, the Florida Supreme Court believed it should be applied retroactively. But what if the court had concluded otherwise and both (1) identified what the amendments were intended to fix and (2) directed that the amendments apply retroactively? I don't mean to suggest that it should have done that with rule 1.442. I merely mean to suggest that this could be what the Florida Supreme Court was saying in *Love* about the prospect that a rule change could, in theory, be "applied retrospectively and . . . to pending cases." *See, e.g.*, *Love*, 286 So. 3d at 181.

This definition of remedial dovetails with *Smiley*'s direction that remedial enactments should be applied "whenever possible." *See Smiley*, 966 So. 2d at 334; *Arrow Air*, 645 So. 2d at 424 ("[T]he presumption in favor of prospective application generally does not apply to 'remedial' legislation; rather, whenever possible, such legislation should be applied to pending cases to fully effectuate the legislation's intended purpose."). Moreover, if "intended to correct, remove, or lessen a wrong, fault or defect" is the true definition of remedial then this may explain how the constitution would permit a substantive statute to be applied retroactively.

Legislation is an expression of the will of the people. If the people identify a flaw or defect in the substantive law and the legislature enacts a statute meant to fix that flaw, it makes sense that the fix ought to be applied "whenever possible" and that due process would not necessarily be violated by the retroactive application of a substantive change made

32

for a remedial purpose.  The measure of process that is due appropriately considers the nature of the rights in play.  *See* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 256 (1868) ("Due process of law in each particular case means, such an exertion of the powers of government as the settled maxims of law sanction, and under such safeguards for the protection of individual rights as those maxims prescribe for the class of cases to which the one in question belongs."); *see also Arrow Air,* 645 So. 2d at 424 ("[T]he presumption in favor of prospective application generally does not apply to 'remedial' legislation; rather, whenever possible, such legislation should be applied to pending cases to fully effectuate the legislation's intended purpose.").

Return now to the review of cases, above, involving substantive enactments. Both *Menendez* and *LaForet* considered (1) substantive enactments that arguably reflected the legislature's policy conclusion that the pre-enactment substantive law was flawed and in need of correction, (2) a legislative expression of intent that the enactments be applied retroactively, and (3) a decision by the supreme court that retroactive application was constitutionally impermissible.  Consider how the analysis might have been different if the term remedial had been clearly defined as "intended to correct, remove, or lessen a wrong, fault or defect."  Even though the enactments had substantive characteristics, if the court had found that the enactments reflected the legislature's intention to correct, remove, or lessen a wrong, fault, or defect in the pre-enactment order, perhaps those enactments would have been labeled remedial rather than substantive.  If so, then perhaps the court would have permitted the retroactive application.  Imagine further that the party seeking retroactive application had argued that there were

substantive rights in play on *both* sides of the case. Arguably, civil litigation involves constitutionally protected property rights on both sides. The founders of America "insist[ed] that the right to property includes not only possession of what one has but also acquisition of what one needs." Thomas G. West, *The Political Theory of the American Founding* 317 (Cambridge University Press 2017); *see also* art. I, § 2, Fla. Const. (protecting as Basic rights) both the right to acquire property and the right to possess and protect it). The point is that temporal reach cases frequently focus only on the rights of one party; however, the definition of "remedial" would be particularly important to understand in a future case where a statute reflected a policy judgment about competing rights: not just the property interests of the one bringing suit, but also the property interests of the one defending its assets against a claimant. If more is not done to define what it means to be remedial, one can imagine how the judicial branch could inadvertently wade into the policy realm.

If what it means for a statute to be "remedial" is that (1) it reflects a policy judgment that a wrong, fault, or defect in the law must be corrected, removed, or lessened, and (2) the legislature expresses an intent that the fix be applied retroactively, then an argument could be made that, for separation of powers reasons, the court should defer to the legislature's direction to apply a remedial statute retroactively, *even if* it impedes a substantive right.

<center>III.</center>

Giving effect to the will of the people shouldn't be harder than nailing Jell-O to the wall. Florida's precedent on proposals for settlement and temporal reach suggests that, at times, it is. Our constitutional order is intended to protect the people's right to be governed as they

<center>34</center>

choose. Where an enactment reflects the will of the people, this branch becomes a threat to self-government if confusion in the law means that the people's will is not given effect.

In this case, the trial judge correctly enforced the proposals for settlement. When the proposals were served, they met the requirements of section 768.79 and rule 1.442 in effect at that time. The proposals were not accepted within 30 days and the trial judge made no finding that the proposals were not made in good faith.

Because *Diecidue* was good law at the time the proposals were served, in my view the Stevenses' failure to timely articulate objections to the proposals undercut their subsequent arguments about those objections. Once we clarified the better practice in *Diecidue*, litigants who chose not to follow that better practice did so at their own risk. As a simple matter of respect for our own precedent, I see no reason to tiptoe around that.

The majority does not really explain what *Diecidue*'s "better practice" language means, in a practical sense. Lawyers throughout the Second District must wait for this issue to be more fulsomely raised in another case and then resolved by this court. Those who must counsel recipients of proposals for settlement in the interim might consider that even if *Diecidue* offered nothing more than an opinion about good etiquette, we all know that negative inferences are often drawn about those who ignore good etiquette.

_____

Opinion subject to revision prior to official publication.

35